UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
FREDERICK L. SABIDO and RICHMOND :
SURGICAL ASSOCIATES PLLC, : **MEMORANDUM**
: **DECISION AND ORDER**
Plaintiffs, :
: 11 Civ. 4120 (BMC)
- against - :
:
STATEN ISLAND UNIVERSITY HOSPITAL, :
NORTH SHORE-LONG ISLAND JEWISH :
HEALTH SYSTEM, INC., BOARD OF :
TRUSTEES OF STATEN ISLAND :
UNIVERSITY HOSPITAL, BOARD OF :
TRUSTEES OF NORTH SHORE-LONG :
ISLAND JEWISH HEALTH SYSTEM, INC., :
RONALD J. MAZZUCCO, ANTHONY C. :
FERRERI, JOSEPH T. MCGINN, JR., MARK :
JARRETT, and BRAHIM ARDOLIC, :
:
Defendants. :
-------------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff Frederick L. Sabido, a physician, brings a panoply of federal and state damage claims arising from the two week suspension of his staff privileges at defendant Staten Island University Hospital ("SIUH"). Defendants have moved to dismiss based on, *inter alia*, the doctrine of primary jurisdiction. The motion is granted to the extent that this action is stayed pending Sabido's submission of a determination by the appropriate agency.

## BACKGROUND

Unless otherwise noted, the following facts are taken from Sabido's amended complaint and are assumed to be true for the purpose of this motion. Sabido is a 47 year-old Black, Hispanic, and American-Indian general surgeon. He co-owns plaintiff Richmond Surgical

Associates, PLCC, a private surgical practice in Staten Island. He alleges that he has "worked as a member of the medical staff . . . and as a member of the teaching faculty" of SIUH since May of 1997.

On March 14, 2010, Sabido was on call and was called in for a surgical consult. SIUH imposed a "summary suspension" after Sabido "supposedly did not come in to consult on [the] patient," although there does not seem to be anything "supposed" about Sabido's non-appearance, as the amended complaint does not allege that he answered the call. According to the amended complaint, Sabido's justification for not answering the call was that the patient had a "do not resuscitate ['DNR'] order" and thus it would have been "inappropriate and unnecessary" for him to have "performed surgery."

Purportedly as a result of his non-appearance, Sabido's hospital privileges were suspended. The privileges were restored about two weeks after this suspension, but by that time, SIUH had reported the infraction to the National Practitioner Data Bank, which injured Sabido's professional reputation.

The crux of Sabido's claim is that his discipline was unwarranted and was motivated by discriminatory animus and an anti-competitive desire to destroy Sabido's private practice and steal his patients. He further argues that, prior to the events giving rise to his discipline, SIUH asked Sabido to "join SIUH's faculty practice" and Sabido declined, expressing fear that SIUH "would simply terminate him after SIUH got control of his practice as he noticed had occurred to other minority or older doctors at SIUH." Sabido asserts that the disciplinary actions were taken in retaliation for this "accusation of institutional racism."

From these facts, Sabido alleges racial, national origin, ethnic, and age discrimination and retaliation under the Civil Rights Act of 1871 (42 U.S.C. § 1981), the Age Discrimination in

Employment Act (29 U.S.C. § 623), Titles VI and VII of the Civil Rights Act of 1964 (42 U.S.C. § §2000d, 2000e et seq.), and corresponding provisions of state and local law; and common law claims for negligence, breach of contract, and tortious interference with prospective contractual relations.[1]

## DISCUSSION

Defendants contend that under the doctrine of "primary jurisdiction," I should dismiss this case pending Sabido's submission and prosecution of an administrative claim before the Public Health and Health Planning Council ("PHHPC"), formerly known as the Public Health Council. Under New York's Public Health Law, a hospital may not diminish a physician's "professional privileges" for any reason except "patient care, patient welfare, the objectives of the institution or the character or competency of the [physician]." N.Y. Pub. Health L. § 2801-b(1). This statute provides that a physician claiming a violation of this statute "may" file a complaint with the public health council. Although phrased in the permissive, the New York Court of Appeals has interpreted this statute to require that, before coming to court, "a physician is obligated to present his claim of an improper practice, in the first instance, to the administrative body charged with the protection of these statutory rights." Guibor v. Manhattan Eye, Ear, & Throat Hosp., 46 N.Y.2d 736, 738, 413 N.Y.S.2d 638 (1978).

The doctrine of primary jurisdiction is implicated when "enforcement of [a] claim requires the resolution of issues, which, under a regulatory scheme, have been placed within the special competence of an administrative body." Johnson v. Nyack Hosp., 964 F.2d 116, 122 (2d Cir. 1992). The doctrine requires courts to allow administrative agencies with particular

---

[1] Sabido voluntarily dismissed his claims for federal and state antitrust violations. However, the amended complaint retains the accusations of an anti-competitive motivation that appeared in the initial complaint.

expertise to resolve complicated factual issues before taking jurisdiction over a dispute. See Darbari v. Lenox Hill Hosp., Inc., No. 10-CV-5101, 2011 WL 1226269, at *3 (S.D.N.Y. Mar. 24, 2011). Although this doctrine is typically applied in the context of federal agencies, the Second Circuit has held that the doctrine also specifically applies to the PHHPC's jurisdiction over claims involving the termination of physicians' privileges. See Johnson, 964 F.2d at 122.

The central function of the PHHPC is to determine whether there was a legitimate medical justification for the withdrawal of a physician's privileges. Sabido therefore argues that the PHHPC does not have primary jurisdiction unless a physician is seeking reinstatement of medical privileges, rather than merely damages. This argument simply ignores Johnson. There, a physician sought damages after his privileges were revoked allegedly pursuant to a conspiracy to violate the antitrust laws. The Second Circuit held that a physician asserting a damages-only claim must first file a complaint with the PHHPC, provided that his claim "turns on whether the hospital legitimately terminated his privileges" and "a legitimate medical reason for the termination is a complete defense to the physician's claim." Id. at 121. This means that a plaintiff may proceed directly to court, without filing a complaint with the PHHPC, only if the claim "does not depend on whether the hospital legitimately terminated his privileges." Id.

In Tassy v. Brunswick Hospital, 296 F.3d 65, 73 (2d Cir. 2002), the Second Circuit explained that district courts should not mechanically dismiss cases under the primary jurisdiction doctrine just because an agency is statutorily authorized to resolve a particular issue. The plaintiff physician in Tassy had his hospital privileges revoked following allegations that he had sexually harassed employees. He claimed that the reason for the revocation was pretextual and that, in fact, he had lost his privileges because he was a black Haitian-American. The Second Circuit declined to apply the primary jurisdiction doctrine, principally because the

4

PHHPC had no special expertise in determining whether the plaintiff had engaged in sexual harassment. However, in reaching its decision, the Court stated as follows:

> In stark contrast to Johnson, this case does not involve allegations of technical incompetence or inadequate patient care, does not implicate any medical data or complex records, and would not benefit from the medical expertise of the PHC.
>
> * * *
>
> We fail to see how the PHC's medical expertise would aid the determination of whether Tassy committed the sexual harassment that has been alleged.

Id. at 70-72. The Court went on to say that the primary jurisdiction doctrine is implicated when "the agency's expertise would assist the court in resolving difficult factual issues," or, said differently, when "an agency's review of the facts will be a material aid to the court." Id. at 73 (internal quotation marks omitted).

In the instant case, defendants read Tassy broadly, arguing that Tassy modified Johnson by holding that "material aid" to the Court is sufficient to invoke the doctrine of primary jurisdiction even when the PHHPC's decision will not provide a "complete defense" to the Title VII claims. From there, defendants argue that since a PHHPC determination would "assist" this Court, even though it would not resolve the Title VII claims, I should defer to the PHHPC's primary jurisdiction.

District courts within the Second Circuit are divided on whether or not Tassy modified Johnson in the manner urged by defendants. The majority of post-Tassy district court decisions interpret Tassy and Johnson as each providing a distinct exception to the primary jurisdiction principle. For example, one court has explained that Tassy provides an exception to the doctrine when "the physician's privileges have been terminated for reasons that do not pertain to medical care," whereas Johnson provides a separate exception when "(1) the plaintiff seeks damages, but

5

not reinstatement; and (2) the presence or absence of a proper medical reason for terminating the plaintiff's privileges is not dispositive of the plaintiff's claims." Mahmud v. Bon Secours Charity Health Sys., 289 F. Supp. 2d 466, 473 (S.D.N.Y. 2003); accord Bauman v. Mount Sinai Hosp., 452 F. Supp. 2d 490, 500 (S.D.N.Y. 2006) (stating that the primary jurisdiction rule is subject to the "two narrow exceptions" set forth in Mahmud); Deshpande v. Medisys Health Network, Inc., No. 07-CV-375, 2008 WL 2004160, at *2 (E.D.N.Y. May 7, 2008) (same).

By reading Tassy and Johnson as establishing two unrelated exceptions to the primary jurisdiction doctrine, these courts impliedly hold that Johnson's "complete defense" standard was untouched by Tassy's "material aid" language. Under a strict application of this interpretation, Title VII cases would rarely warrant the invocation of primary jurisdiction. This is so because the PHHPC's decision will never provide a "complete defense" to a Title VII claim; even if the PHHPC were to find a medical justification for a plaintiff's termination, he would always have the chance to demonstrate that the medical justification was used as a pretense for discrimination. Indeed, one district court has directly held that Johnson's rule survives Tassy and dictates that the doctrine of primary jurisdiction does not apply when, as here, the medical reasons for the plaintiff's adverse employment action is not a "complete defense" to his Title VII claim. See Chandra v. Beth Israel Med. Ctr., No. 09-CV-6619, 2011 WL 180801, at *2 (S.D.N.Y. Jan. 19, 2011).

However, other district courts that have faced Title VII claims in this context have been unwilling to apply Johnson so rigidly. Despite having originally laid out the two-exception analysis of Tassy and Johnson, for example, the Mahmud court went on to hold that the primary jurisdiction doctrine applied to the plaintiff's discrimination claims because the PHHPC's conclusion "*may* be . . . determinative" of these claims. 289 F. Supp. 2d at 475 (emphasis

6

added). More recently, Judge Seybert held that the doctrine applies to Title VII claims because Johnson came before Tassy, "which teaches that primary jurisdiction is appropriate whenever the PHC's technical expertise would materially aid the Court." Esan v. Franklin Hosp., No. 10-CV-1301, slip op. at 17 (E.D.N.Y. Dec. 6, 2010).

I agree with the reading of Tassy adopted by Judge Seybert and defendants in this action. In so holding, I recognize that Tassy's "material aid" language was dictum; because the inquiry in Tassy concerned whether the plaintiff was a sexual harasser, a PHHPC determination on that issue would have neither "assisted" the Court nor provided a "complete defense" to the plaintiff's claim, and the Tassy court therefore did not have to choose between the two options. Yet the dictum is based on the fairly well-defined operation of the primary jurisdiction doctrine outside the context of Title VII.

As the Tassy court noted, the primary jurisdiction doctrine originated in Texas & P. Ry Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S. Ct. 350 (1907). There, the plaintiff shipper brought a state court action against a common carrier, seeking to recover what were alleged to be excessive shipping charges. The Texas Supreme Court recognized that the common law required a carrier to charge only reasonable and non-discriminatory rates (i.e., a carrier could not charge shippers different rates for the same service), and allowed a shipper who protested the rates as unreasonable to maintain an action to recover the difference.

In Abilene, the issue before the United States Supreme Court was whether a shipper could resort to a common law action without first challenging the shipping charge with the Interstate Commerce Commission, an agency charged by Congress with the task of determining whether shipping rates were "just and reasonable." A unanimous Court held that maintenance of the common-law right of action, without first resorting to the Commission's primary jurisdiction,

7

could result in conflicting determinations from various courts as to the reasonableness of rates and would destroy the uniform rates that Congress had intended to ensure through creation of the Commission. The Court therefore required the plaintiff to first petition the Commission about the allegedly excessive rates and let the Commission decide if they were excessive.

Left unaddressed in Abilene was whether there would be anything left for the state court to do once the Commission ruled on the plaintiff's claim of excessive fees. This is important for our purposes because, if the complaint before the Commission effectively determined the dispute, with nothing more to occur in state court, then it would suggest that deferring to an agency's expertise is only appropriate when the agency completely determines the dispute.

However, subsequent Supreme Court cases make it clear that courts generally have discretion to defer to an agency's expertise when an administrative determination will "assist" the court in determining the plaintiff's claims but will not completely resolve the dispute. For example, in Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S. Ct. 573 (1973), the Court held that the Seventh Circuit had properly stayed an antitrust case in order to allow the Commodity Exchange Commission to consider the case first. Although the dissenting Justices argued that the Commission could not provide the ultimate remedy sought by the plaintiff, the majority held that the matter should nevertheless be stayed and referred to the Commission because it was "very likely that a prior agency adjudication of this dispute will be a material aid" to the courts' resolution of certain issues. Ricci, 409 U.S. at 305; accord Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 68, 91 S. Ct. 203 (1970) ("When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved.").

It has now become settled law that staying an action, rather than dismissing it without prejudice, is the preferred outcome in primary jurisdiction cases where the plaintiff may be prejudiced by the passage of a statute of limitations. See Mathirampuzha v. Potter, 548 F.3d 70, 84 (2d Cir. 2008) (citing Reiter v. Cooper, 507 U.S. 258, 268-69, 113 S. Ct. 1213 (1993)). This necessarily implies that the agency determination may or may not be determinative of the court proceeding. It thus compels the conclusion that primary jurisdiction is appropriately invoked where the agency's expertise may be helpful to the Court, even if an agency determination would not be a "complete defense" to the action before the Court.

There is no question here that a decision from the PHHPC on the issue of whether Sabido violated a required standard of care by not responding to a call for a patient with a DNR order will be of assistance to this Court. It goes directly to the second prong of the test under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-05, 93 S. Ct. 1817 (1973), that is, whether SIUH had a bona fide business (i.e., medical) justification for suspending Sabido's privileges. The appropriate response of an on-call physician in this situation is squarely within the ambit of the PHHPC's expertise, and while I, or more likely the jury, could listen to competing experts and decide whether Sabido's failure to respond was appropriate, the primary jurisdiction doctrine does not require an inability to judicially determine an issue; rather, it just requires that an agency's expertise will assist the Court in making that determination.

Although not technically a primary jurisdiction case, satisfaction of the "material aid" standard here is demonstrated by the Second Circuit's decision in Collins v. NYC Transit Auth., 304 F.3d 113 (2d Cir. 2002). In that Title VII action, the Court affirmed a grant of summary judgment against the plaintiff based largely on the decision of an arbitration board finding that termination was warranted because the plaintiff had assaulted his supervisor. The Court held:

9

> [A] negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee. However, a decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact – *e.g.*, evidence not before the tribunal – or that the impartiality of the proceeding was somehow compromised. Here, however, the tribunal received all the available evidence in an evenhanded proceeding and rendered a decision consistent with the almost overwhelming evidence of appellant's assault . . . .

Id. at 119 (citation omitted). If an arbitration panel's decision on mundane factual questions, requiring no expertise, such as who assaulted whom, is deemed to be not only of assistance to a court, but highly probative evidence, then it follows *ipso facto* that the expertise of the PHHPC will be helpful in this Court's determination of whether Sabido complied with a required standard of care in declining to respond to a call on behalf of a patient with a DNR order.

## CONCLUSION

Defendants' motion is granted to the extent that this action is stayed pending a determination by the PHHPC as to whether the suspension of Sabido's privileges was appropriate.

**SO ORDERED.**

                                                              _____ s/ BMC_____
                                                                             U.S.D.J.

Dated: Brooklyn, New York
       April 4, 2012